## Case No. 7,635.

### KEATING v. KEEFER.

[5 N. B. R. (1871) 133;[1] 4 Am. Law T. 162; 1 Am. Law T. Rep. Bankr. 266.]

Circuit Court, E. D. Michigan.

FRAUDULENT CONVEYANCE—ACTION TO SET ASIDE —BANKRUPT GRANTOR—DEED TO WIFE— WIFE'S EARNINGS.

A debtor conveyed his farm to his wife but did not record the deed until seven years after its execution; during this time, however, he appeared as the owner. Being adjudged a bankrupt, his assignee filed a bill to obtain a conveyance of this property to him (the assignee) for the benefit of the creditors. The wife claimed that the money paid for the property was her's, giving this as a reason why she held the conveyance, and denied any intention of hindering or defrauding her husband's creditors. The evidence showed that the husband purchased the farm on a contract made to himself, but that after the first installment of purchase money was paid, the property was conveyed to the wife. Further payments were made until about half the amount agreed upon was paid. At the time the conveyance was made to the wife the bankrupt was considerably in debt, which indebtedness constituted a portion of his liabilities in the bankruptcy proceedings. Almost all of the money paid on the farm was from proceeds of property, the title to which at the time of sale was in the bankrupt, which property was partly paid for by the wife with money earned by herself after her marriage. The court decided that if a married woman consents to the purchase of property with her means by her husband and in his own name, she cannot afterwards reclaim the property as against his creditors, whose debts accrued while the property was so held by him. A decree entered declaring the property assets of the bankrupt and subject to be distributed under the act for the payment of his debts.

[Appeal from the district court of the United States for the Eastern district of Michigan.]

Bill to obtain a conveyance and delivery to the assignee of certain assets of the bankrupt, Henry M. Keefer, alleged to be held by the defendant in fraud of creditors. Answer on oath, replication and process.

Walker & Kent, for complainant.
G. V. N. Lothrop, for defendant.

LONGYEAR, District Judge. It appears from the pleadings and proofs that on the seventeenth day of August, eighteen hundred and sixty, Henry M. Keefer purchased a farm in Hillsdale county, Michigan, described as follows: the south-east quarter of section twenty-nine, in the township of Hillsdale, containing one hundred and sixty acres of land, more or less, for four thousand dollars, to be paid, one thousand dollars on the first of April, and the balance in installments as specified, and took a contract for the same to himself; and that on the twelfth day of March, eighteen hundred and sixty-one, the one thousand dollars was paid and the land was conveyed to the defendant [Elmira C. Keefer], then and still the wife

[1] [Reprinted from 5 N. B. R. 133, by permission.]

of the said Henry M. Keefer, she and her husband giving a mortgage back for balance of purchase money; that since then payments have been made of the interest, and one thousand dollars more of the principal; that by improvement upon the land and the rise of value in real estate, the same is now worth at least eight thousand dollars, and that at the time the bankruptcy proceedings were commenced, there was upon the said farm personal property of the value of about two thousand dollars. It further appears that at the time the said land was so conveyed to the defendant, the said Henry M. Keefer was considerably in debt, which indebtedness constitutes a portion of his liabilities in the bankruptcy proceedings. The bankruptcy proceedings were commenced and the said Henry M. Keefer was adjudged a bankrupt upon his own petition, and none of the said real estate or personal property are included in his schedule of assets. It further appears that the liabilities of the said bankrupt are nearly two thousand eight hundred dollars, and that the assets which were included in his schedule are nearly worthless.

It is claimed by the complainant that the conveyance of said real estate to the defendant was so made, and that the title to said property is now held by her with intent to delay, hinder and defraud the creditors of the said Henry M. Keefer, and ought now to be conveyed to the complainant to be distributed as a part of the said bankrupt's estate. It is claimed and set up by the defendant that the purchase of said lands and the payments which have been made were with her money and for her, although in the first instance in the name of her said husband, and the same was conveyed to her for that reason and without any intent to hinder, delay or defraud the creditors of the said bankrupt, and that the same belongs to her in her own right; that at the time the said conveyance was so made to her, her said husband was amply solvent and had other property, more than sufficient to satisfy all his liabilities; and that the said personal property has accrued to her since she has owned said farm from her own means, and also belongs to her of her own right, and consequently that none of said property, real or personal, is liable for her husband's debts. In this connection the following facts appear: one thousand seven hundred dollars of the moneys which have been paid on the purchase of the farm, were the avails of the sale of a house and three lots in the village and county of Hillsdale, the title to which, at the time of the sale, was in the said Henry M. Keefer. The balance of the moneys which have been so paid, Mrs. Keefer states in her testimony, was derived from the farm and from her earnings selling sewing machines, but what proportion of it was derived from the farm, and what proportion from her earnings, nowhere appears. The defendant was married to Keefer in October, eighteen hun-

dred and fifty, and soon after, in eighteen hundred and fifty-one, the house and one of the lots, by the sale of which the one thousand seven hundred dollars was raised, were purchased, and the other two lots (as testified to by defendant and by Keefer,) within four or five years thereafter, although the deeds bear a somewhat later date. Keefer made the negotiations for the purchases, and the deeds were made to him, and the title remained in him up to the time the property was sold, which 'was some time in eighteen hundred and sixty. This village property was paid for with money earned by Mrs. Keefer as a tailoress after her marriage to Keefer. During all this time they kept house, and Keefer supported the family. The tailoring business by which the money was earned was conducted by Mrs. Keefer at their house.

Upon these facts, two important questions of law arise: 1. At the period of time in question, was property acquired by a woman by her own personal industry after marriage, liable for her husband's debts? 2. When a married woman consents to the purchase of property with her means, by her husband in his own name, can she afterwards reclaim the property as against his creditors, whose debts accrued while the property was so held by him?

First. The solution of the first question above stated, depends upon the construction to be given to the statutes of Michigan, relative to the rights of married women in force during the time the events in question were transpiring. The first of these statutes was passed in eighteen hundred and forty-four (Laws Mich. 1844, p. 77), re-enacted in the Revised Statutes of 1846 (page 340, § 25), and embodied in the Compiled Laws of 1857 (volume 2, p. 965, § 328), and so far as this question is involved, is as follows: "Any real or personal estate which may have been acquired by any female before her marriage, either by her own personal industry, or by inheritance, gift, grant or devise, or to which she may at any time after her marriage be entitled by inheritance, gift, grant or devise, and the rents, profits and income of any such real estate, shall be and continue the real and personal estate of such female after marriage, to the same extent as before marriage, and none of said property shall be liable for her husband's debts, engagements or liabilities." This act remained in full force until the act of eighteen hundred and fifty-five (Laws Mich. 1855, p. 420; 2 Comp. Laws, p. 966, § 3292), which, so far as this question is involved, is as follows: "That the real and personal estate of every female, acquired before marriage, and all property real and personal, to which she may afterwards become entitled by gift, grant, inheritance, devise, or in any other manner, shall be and remain the estate and property of such female, and shall not be liable for the debts, obligations and engagements of her husband."

It will be observed in the act of eighteen

hundred and forty-four, property acquired by a female by her own personal industry is specifically mentioned in regard to property acquired by her before marriage, and that while the same qualifications otherwise made in regard to such property, are retained in regard to property acquired by her after marriage, that as to property acquired "by her own personal industry," is entirely omitted. This renders it perfectly clear to any mind, that it was the intention of the legislature in the act of eighteen hundred and forty-four, to leave property acquired by a female by her own personal industry after marriage, the same as it was at common law, viz., to be the property of the husband, and of course liable for his debts. The use of the words "by her own personal industry," as to property acquired before marriage, and the omission of them as to property acquired after marriage, taken in connection with the fact that other qualifying words are used, and that they are the same in both cases, in my opinion has the same effect as an express exception as to property so acquired after marriage. I am aware that legislation has since then made advances in this regard, and that in some directions, and perhaps upon the very question now under consideration, broader and more liberal views have obtained. But this will not warrant the court in disregarding the plain and clear intent and meaning of the law in force at the time the events in question were transpiring. The house and lot first purchased in Hillsdale village were purchased in eighteen hundred and fifty-one, and were evidently fully paid for while the act of eighteen hundred and forty-four was in full force, and before it had been in any manner altered by the act of eighteen hundred and fifty-five, or any other subsequent act. I hold, therefore, that the means used to purchase that house and lot (from the sale of which one thousand seven hundred dollars of the two thousand dollars paid on the purchase money of the farm in question, as we have seen, was in large part derived,) were the means of the bankrupt, Henry M. Keefer, and not those of the defendant, and that the same, and of course the avails of it, were the property of said Henry M. Keefer and liable for his debts. As to the other two lots, it is not so clear from the evidence, as to when they were actually purchased. The deed for those lots, by which they were conveyed to Keefer, bears date May fourteen, eighteen hundred and fifty-seven, but there is considerable evidence tending to show that the purchase was made a long time before that. Mrs. Keefer in her testimony says: "I bought the house and lot in eighteen hundred and fifty-one. I could not tell exactly when I bought the north lot, but it was three or four years after, and the south lot was bought within four or five years after I bought the first one." She also testifies that she does not remember exactly when she paid for the north lot, and says: "I did not have to pay anything down on it. I don't remember how much I paid in sewing or how much money. I don't remember when it was paid. It was a good while ago." She also says she does not remember now when she paid for the south lot. "A part of it was paid to Morse," (of whom the purchase was made), "and a part of it went to McCullum" (who made the deed), "but I don't remember how much." Although these lots were purchased of different persons, one of McCullum, and one of Morse, yet McCullum makes the deed for both.

From all these facts and circumstances, I think it fairly presumable that these lots were actually purchased and were held on contract for a considerable time before the deed was given, but how long before the evidence is quite uncertain and by no means satisfactory. On looking into the deed, however, I find in the warranty for quiet and peaceable possession, the following exceptions: "Except as against taxes that may have been assessed on lot number one hundred and twenty-eight, since the year eighteen hundred and fifty-one, and except as against taxes that may have been assessed on lot one hundred and thirty, since the year eighteen hundred and fifty-two." This is somewhat significant, and taken in connection with the other facts in relation to the purchase of these lots, tends strongly to show that these lots had been held by Keefer during all the excepted years, and that they were actually purchased, one in eighteen hundred and fifty-one or eighteen hundred and fifty-two, and the other in eighteen hundred and fifty-two or eighteen hundred and fifty-three, and under all the circumstances of the case I cannot come to any other conclusion than that they were so purchased. The act of eighteen hundred and forty-four, therefore, and the construction already given it, apply to these other two lots as well as to the house and lot first purchased, and these are held to have been also the property absolutely, of the bankrupt Henry M. Keefer. It does not matter that a portion of the consideration or purchase price for the two lots may have been paid after the act of eighteen hundred and forty-four had been altered by the act of eighteen hundred and fifty-five. It does not appear whether such was the case or not. Having found that the property in these lots acquired by the original purchase was the property of the husband, the payment by the wife (if any) towards that purchase of her own money, without insisting upon any agreement for re-payment or conveyance of any interest to her, I think, under the circumstances of this case, if not in all cases, should be deemed conclusive evidence of the gift of the money to the husband without any right on her part to reclaim any interest in the land or in its proceeds on account of such payment as against him or his creditors. See Campbell v. Campbell [21 Mich. 438].

This view of the case renders it unnecessary to consider what alterations in the law were effected by the act of eighteen hundred and fifty-five. No opinion is therefore expressed upon that question.

Henry M. Keefer purchased the farm in question August the seventeenth, eighteen hundred and sixty, and took a contract for the same to himself. The consideration was four thousand dollars. One thousand dollars and interest on the whole sum was to be paid April first, eighteen hundred and sixty-one, when a deed was to be given and a mortgage taken back for balance of purchase money. The Hillsdale village property, which has been the subject of consideration thus far, was sold in February, eighteen hundred and sixty-one for one thousand seven hundred dollars, of which one thousand, or very nearly that, was paid in cash, and the balance in a certificate of deposit of the banking house of McCullum & Co., of Hillsdale. Soon after this, the one thousand dollars received in cash on the sale of the village property was paid on the contract for the farm, and a deed of conveyance was made to the defendant, which deed bears date March twelfth, eighteen hundred and sixty-one. A mortgage was given back for balance of purchase money as provided in the contract, which mortgage was given by the defendant. Henry M. Keefer, the husband, joined with the defendant in the mortgage, but I do not regard that circumstance as of any importance. The banking house, whose certificate of deposit had been taken in part payment for the village property, failed soon after, and the certificate was not available, but Henry M. Keefer raised the amount from other property and it was paid on the mortgage on the farm. The balance of the two thousand dollars of principal and the interest which have been paid on the purchase of the farm, over and above the said one thousand seven hundred dollars, avails of the village property, has been paid in the main from the issues and profits of the farm. The village property being, as we have seen, the property of Henry M. Keefer, the use which was so made of the proceeds of the sale of the same, and the vesting of the title to the land in question, in the defendant, constitutes a gift to or settlement upon her of the land, to the same extent and with the same effect as if Henry M. Keefer had made a formal assignment of the contract to her, or the land had been first conveyed to him and then by him conveyed to her. It was undoubtedly entirely competent for Keefer to do this if he had owed no debts, and if it was not done with reference to indebtedness to be incurred in the future. But how is it in the present case? The statute of Michigan then in force provided, as it does now, that "every conveyance or assignment in writing or otherwise, of any estate or interest in lands or in goods or things in action, or of any rents or profits issuing therefrom, and any charge upon lands, goods or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts or demands, * * * as against the persons so hindered, delayed or defrauded, shall be void."

The supreme court of the United States, in remarking upon the statute of Alabama, which is substantially like that of Michigan above quoted, in the case of Parish v. Murphree, 13 How. [54 U. S.] 92, 98–100, Justice McLean delivering the opinion of the court, makes use of the following language: "If an individual being in debt shall make a voluntary conveyance of his entire property, it would be a clear case of fraud; but this rule would not apply if such a conveyance be made by a person free from all embarrassments and without reference to future responsibilities." "If the facts and circumstances show clearly a fraudulent intent, the conveyance is void as to all creditors, past or future. Where a voluntary conveyance is made by an individual free from debt, with a purpose of committing a fraud upon future creditors, it is void under the statute. And if a settlement be made without any fraudulent intent, yet if the amount thus conveyed impaired the means of the grantor so as to hinder or delay his creditors, it is as to them void." "But to avoid the settlement, insolvency need not be shown nor presumed."

In the case now under consideration, Henry M. Keefer, according to his own testimony, was owing about nine hundred dollars at the time of the conveyance of the farm to the defendant. Besides this, there was the seven hundred dollars for the certificate of deposit received by him in part for the sale of the village property, which he and defendant both say he owed to defendant. This would make his indebtedness, according to his and defendant's own figures, up to about sixteen hundred dollars. His property at that time, he says, consisted of forty acres of land which he afterwards sold for seven hundred dollars, and "personal property invoiced in September, eighteen hundred and sixty, to the amount of one thousand, eight hundred dollars to two thousand dollars." The forty acres of land he sold in December, eighteen hundred and sixty, and applied the proceeds, as appears from the evidence, to payment on the mortgage given by defendant on the land in question, on account of the said certificate of deposit. This reduced his liabilities to nine hundred dollars, and his assets to the personal property which invoiced in September previous at one thousand eight hundred dollars to two thousand dollars, and the said certificate of deposit for seven hundred dollars. It appears that this personal property consisted in large part of notes and accounts against various persons, probably for goods sold while he was in

business. From these he had been collecting for some time, and it is not to be presumed that what were left were worth anything like their face. At all events they would constitute but a very poor basis upon which to rely for the payments of debts. He does not tell us what the "personal property," besides these notes and accounts, was, or what it was worth. And as to the certificate of deposit, it appears that the banking house had already failed, or at least had made an assignment, and that the same was and still is unavailable.

Under this state of facts I can have no doubt that the transfer to the defendant of the proceeds of the sale of the village property and of the land in question, did seriously impair the means of Henry M. Keefer so as to hinder or delay his then creditors in the collection of their debts. What has been said thus far, applies only to the indebtedness existing at the time of the transfer. It appears however, that Keefer's present liabilities exceed his then liabilities by some two thousand dollars, which of course have been incurred since the transfers. In regard to this subsequent indebtedness it is enough to simply state the facts, that the deed to defendant was not placed upon the public records until some seven years after it was given; that in the mean time Keefer, with defendant's knowledge and apparent consent, appeared in every respect as the owner, buying, selling and mortgaging the personal property, and leasing the farm as his own and in his own name, thus inspiring confidence in his responsibility and enabling him to obtain credit which he probably could not have done if the facts had been understood, and finally that a large amount of his subsequent indebtedness is for matters directly connected with and for the improvement and betterment of the very land here in controversy.

The circumstances of this case are such as to force the conviction upon my mind that the transfers to defendant, and the placing of the title to the land in question in her name were made and done with intent to hinder, delay and defraud not only the then existing creditors of Henry M. Keefer, but his future creditors also. A decree must be entered in accordance with the foregoing conclusions, and declaring the said farm, together with all the stock, grain and other personal property upon it, except such as the law excepts, assets of the said bankrupt, Henry M. Keefer, and subject to be disposed of and distributed under the bankrupt act for the payment of his debts and the expenses of the bankruptcy proceedings, and for delivery and surrender up to the complainant as assignee of the said bankrupt, of the possession of all said property, except as aforesaid, for the accounting by the defendant of all personal property on said farm at the time the bankruptcy proceedings were commenced, sold, disposed of or converted by her, other than for the necessary keep of the live stock, and for the preservation of said property, and requiring the defendant to execute and deliver all conveyances, releases, assignments, transfers or acquittances necessary to carry said decree into full force and effect, and for costs to the complainant.

[NOTE. Upon a previous consideration of this matter of the deed of March 12, 1861, by Henry M. Keefer to his wife, Elmira C. Keefer, upon opposition by one of the creditors of said Keefer to Keefer's discharge in bankruptcy, the same judge held that from the facts shown in that case no cause was made out why the discharge might not issue. Case No. 7,636.]